FILED
2008 Apr-01  PM 01:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

SHIRLEY BRADLEY,                     )

     PLAINTIFF,                     )

VS.                                  )                     **2:06-cv-4808-JHH**

FAIRFIELD CIVIC CENTER               )
AUTHORITY,
                                     )
     DEFENDANT.

## MEMORANDUM OF DECISION

The court has before it the November 7, 2007 motion (doc. # 24) of

defendant Fairfield Civic Center Authority (FCCA) for summary judgment.

Pursuant to the court's November 8, 2007 order, the motion was deemed

submitted, without oral argument, on December 6, 2007.

## I. Procedural History

Plaintiff Shirley Bradley commenced this action on December 1, 2006 by

filing a complaint in this court against the FCCA, alleging violations of Title VII

of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.  More

specifically, Bradley contends that she was subjected to gender harassment by an

FCCA Board member, Howard Cook, and that she was terminated in retaliation

for her complaints of gender harassment.   Defendant's November 7, 2007 motion

for summary judgment asserts that there are no genuine issues of material fact and

that defendant is entitled to judgment as a matter of law.

Both parties have filed briefs and submitted evidence in support of their

respective positions.  Defendant submitted a brief (doc. # 25) and evidence[1] (doc.

# 26) in support of its own motion for summary judgment on November 7, 2007.

On November 29, 2007, plaintiff filed a brief (doc. # 28) and evidence[2] (doc. # 29)

in opposition to defendant's motion for summary judgment.  Despite the

opportunity to do so (see doc. #27), defendant did not file a brief in reply to

plaintiff's opposition.  After consideration of the briefs and evidence submitted to

the court, the court finds that defendant's motion (doc. #24) for summary

judgment is due to be denied in its entirety for the reasons outlined below.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[1] The defendant submitted the following evidence: deposition of Shirley Bradley; deposition of Michael Johnson; deposition of Howard Cook; deposition of F.D. Scott; deposition of Nettie Allen; deposition of Margaret Hollins; sexual harassment policy; 1/14/06 letter to Bradley regarding administrative leave with pay; 1/18/06 letter to Bradley regarding determination hearing; 1/20/06 termination letter; handwritten notes/journal.

[2] The plaintiff submitted the following evidence: declaration of Cradley; excerpts of Bradley's answers to interrogatories; amended EEOC charge; termination notice.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See Celotex Corp., 477 U.S. at 323.  After the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

3

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Prop., 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to

4

affirmatively show the absence of evidence in the record to support a judgment for

the non-moving party on the issue in question.  This method requires more than a

simple statement that the non-moving party cannot meet its burden at trial but does

not require evidence negating the non-movant's claim; it simply requires the

movant to point out to the district court that there is an absence of evidence to

support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the

movant meets its initial burden by using this second method, the non-moving party

may either point out to the court record evidence, overlooked or ignored by the

movant, sufficient to withstand a directed verdict, or the non-moving party may

come forward with additional evidence sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency.  However, when

responding, the non-movant can no longer rest on mere allegations, but must set

forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996)

(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[3]

The FCCA is an incorporated entity, created pursuant to state law in 1993,

---

[3] These are the facts for summary judgment purposes only.  They may not be the actual facts.  See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted).  Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 2 F.3d at 1115.

which "manages and controls the municipal complex of the Fairfield Civic Center." (Johnson Dep. at 11-12.) It is managed by a three-member Board, who are appointed by the Fairfield city counsel, upon recommendation of the mayor. (Id. at 12.) At all relevant times, the members of the Board were Mayor Michael Johnson, city councilman Reverend F.D. Scott, and Fairfield resident Howard Cook. (Id.) The mayor serves as the ex officio Chairman, and Cook acts as the liaison and "point person" for the Board regarding the day-to-day operations of the FCCA. (Johnson Dep. at 13, 29.) Cook, however, is not a paid employee of the FCCA. (Cook Dep. at 13.) Within the municipal complex, the FCCA manages Glory's Restaurant.[4] (Id. at 13-14.)

Shirley Bradley began her employment in Glory's Restaurant as a waitress in July 2004. (Bradley Dep. at 16.) Four months later, in December 2004, Bradley was promoted to floor manager.[5] (Id. at 21-22.) As floor manager, Bradley's duties included supervising the wait staff, preparing the work schedule, ensuring that the front of the restaurant was clean, and making bank deposits. (Id. at 20,

---

[4] Before the end of 2004, Glory's Restaurant was managed by Eurest, a private company. (Bradley Dep. at 9, 19; Cook Dep. at 7.)

[5] At the time of her hire, Eurest was Bradley's employer. (Bradley Dep. at 21-22.) Sometime between the time of her hire and the time of her promotion to floor manager, the FCCA assumed management responsibility of Glory's Restaurant. (Id.) The record is unclear exactly when this transition occurred.

23.)  Her direct supervisor was the general manager, who was responsible for the

entire municipal complex, including the restaurant.  (Id. at 23-24.)  Initially,

Chuck Radcliff was the general manager, and Margaret Hollins assumed that

position in about June 2005.  (Id. at 23; Bradley Decl. ¶ 3; Johnson Dep. at 34.)

### A. FCCA's Sexual Harassment Policy

The FCCA contends that the following sexual harassment policy was in

force at the time Bradley was employed:

> It is the policy of the City of Fairfield that it will not tolerate
> sexual harassment in the workplace.  Specifically, unwelcome
> sexually oriented verbal or physical conduct by an employee, vendor
> or invited guests whih [sic] harass, disrupts or interferes with an
> employee's work performance or which creates and [sic] intimidating,
> offensive or hostile work environment is strictly prohibited.
>
> Each management official has a responsibility to maintain the
> workplace free from any form of sexual harassment.  No management
> official or any employee is to threaten or insinuate, either explicitly or
> implicitly, that an employee's refusal to submit to sexual advances
> will adversely affect the employee's employment, evaluation, wages,
> advancement, assigned duties, shifts or any other condition of
> employment or career development.  In addition, no management
> official or any employee[s] is to favor in any way an applicant or
> employee because that person has performed or shown willingness to
> perform sexual favors for the supervisor.
>
> Other sexually harassing or offensive conduct in the workplace,
> whether by supervisors or non-supervisory personnel is also
> prohibited.  Such prohibited conduct includes but is not limited to:
>    1. Sexual touch, advances, or propositions;
>    2. Verbal abuse of a sexual nature;

7

> 3.  Graphic or suggestive comments about an
> individual's dress or body;
> 4.  Sexually degrading words to describe an individual;
> and
> 5.  The display in the work place of sexually suggestive
> objects or pictures, including any nude photographs.

(Def.'s Ex. G.)  The policy calls for an employee to report any harassment "as

soon as possible" to either the mayor, department head, or immediate supervisor.

(Id.)  It further states that "[a]ll complaints of sexual harassment shall be

investigated by either the Department head, the Mayor, or her/his designee."  (Id.)

Whether this sexual harassment policy was in force at the time Bradley

worked for the FCCA and whether it was communicated to the employees is

disputed.  Bradley maintains that she was not aware of any sexual harassment

policy: "I was never informed of and never heard that the [FCCA] had any policy

regarding sexual harassment or reporting it.  I never received, saw, or heard of any

document that addressed sexual harassment or reporting it."  (Bradley Decl. ¶ 1.)

Johnson, however, testified that he explained the sexual harassment policy during

an orientation that he conducted for all employees.  (Johnson Dep. at 19.)  He

further stated that he provided a copy of this policy to each employee at the

orientation and required each employee to sign a written acknowledgment that

they received it.  (Id. at 18-21.)  Johnson testified that Bradley received a copy of

8

the policy during this orientation, but that her acknowledgment form was missing from her personnel file.  (Id. at 19-22.)  Because of the standards at summary judgment, the court assumes, as Bradley testified, that there was no sexual harassment policy in place at the time she was employed by the FCCA.

### B.  Bradley's Problems at Work

Problems began for Bradley after she became floor manager of Glory's Restaurant.  A short time after assuming this position, Glory's Restaurant received a low rating from the health department.  (Bradley Dep. at 82-83.)  As a result, Radcliff, Hollins and Bradley were all disciplined.  (Id.)  As the general manager, Radcliff was docked two days pay, and Hollins and Bradley were docked one day's pay.  (Id.)  After the rating was improved, however, the discipline was rescinded and her pay was restored.  (Id. at 153; Cook Dep. at 47.)

Mayor Johnson testified that Hollins and Cook reported performance problems with Bradley to him.  Mayor Johnson testified that the following deficiencies were reported to him while Bradley was floor manager:(1) Bradley would sit around and spend too much time talking to the customers; (2) Bradley was unable to complete the time cards correctly; (3) she did not properly operate the cash register; (4) Bradley did not keep her area clean; and (5) she did not properly train her employees.  (Johnson Dep. at 38, 123.)  Johnson did not testify

9

that he personally observed any of these performance problems or that he investigated the reports of her poor performance.  Bradley denies that she had any of the foregoing deficiencies.  (Bradley Decl. ¶ 4.)  Scott testified that he once approached Bradley about wiping the windowsills and cleaning her area, and that she responded by being "smart" with him.  (Scott Dep. at 27-28.)  Bradley denies that this incident ever occurred.  (Bradley Decl. ¶ 5.)

Cook verbally reprimanded Bradley for her attitude problems on two or three occasions.  (Bradley Dep. at 132-33, 137.)  No formal written warnings were ever given to Bradley regarding her alleged attitude problem.[6]  In addition, although "serious" verbal warnings were memorialized on paper, (Cook Dep. at 24-25, 36), Cook never did so regarding his verbal warnings to Bradley.  Bradley disputes that she had an attitude problem, and instead testified that she began to distance herself from Cook because of his behavior and she believed he perceived those actions as an attitude problem.   (Id. at 101, 138.)

In the fall of 2005, Bradley was also verbally reprimanded[7] by Cook for

---

[6] Written disciplinary warnings are given by the Board.  (Cook Dep. at 36.)  Cook never went to the Board about the possibility of giving Bradley a written warning for her alleged performance deficiencies.  (Id. at 160.)

[7] Bradley disputes that Cook "reprimanded" her for this conduct.  This dispute is without merit.  Although she did not receive a formal written warning, the record is undisputed that Cook verbally reprimanded Cook for taking the tips of the wait staff.

taking the tips left for the wait staff, who made considerably less money than Bradley.  (Id. at 86-88; Cook Dep. at 66.)  When Cook confronted her with this issue, Bradley told Cook that she believed she was entitled to the tips because the wait staff "wouldn't half work" and she was having to do their job for them. (Bradley Dep. at 86-87.)  Cook told Bradley to stop taking the tips.  (Id.) Although Bradley saw nothing wrong with taking the tips when she was doing the work, Bradley agreed to stop taking the tips from the wait staff.  (Id.)

Bradley also had problems with the clerical duties, which were her responsibility as floor manager.  For example, an employee at city hall notified Bradley that she was not processing the time cards correctly.  (Id. at 108-09; Johnson Dep. at 46.)  Bradley responded by stating that she was completing the time cards with the method used by a previous employer and that was the way she was "used to doing it."  (Bradley Dep. at 108, 109.)  According to Bradley, she informed Cook about the problem and Cook told her not to "pay . . . any attention" to the employees at city hall because they were out to "get" Cook.  (Id. at 109.) Cook, however, gave the responsibility of processing the time cards to another employee, who complied with the process used by city hall.  (Id. at 110.)

*C.  The Alleged Harassment and Bradley's Complaints*

Bradley alleges that the first time Cook acted inappropriately toward her

11

was in July or August of 2005 when he stopped by her house for a drink.[8]
(Bradley Dep. at 48.)  Bradley testified that Cook brought a bottle of vodka with
him to her house and began drinking by himself.  (Id. at 50.)  Everything was fine
until Cook finished his second or third drink.  (Id.)  At that point, Cook moved the
conversation in a direction Bradley viewed as inappropriate.  Bradley alleges that
Cook said "'[p]ussy and dick ain't shit.  I'm retired.  I enjoy my money' and things
of that nature."  (Id. at 48.)  Bradley was unsure what he meant by these
statements, but assumed that "he was trying to get around to talk about sex."[9]  (Id.
at 51.)  Bradley did not like this comment so she told Cook that she had things to
do and began dusting her furniture and tables.[10]  (Id. at 52-53.)  Cook left about ten
minutes later.  (Id. at 53.)  Bradley testified that she did not report this incident to
anyone.  (Id. at 54.)

　　　　After the incident at her house, Bradley testified that Cook began harassing
her on a daily basis.  For example, Bradley alleges that Cook would follow her

---

[8] It is unclear whether this visit was out of the ordinary; Bradley testified, however, that she and Cook were friends and that she had been friends with Cook's wife for some time. (Bradley Dep. at 14, 49.)

[9] In her sworn interrogatories, dated before her deposition, Bradley stated that she believed the comment was meant to insinuate that Cook wanted to have sex with her.  (Pl.'s Ex. 2.)

[10] Bradley did not explicitly ask Cook to leave.  (Bradley Dep. at 52-53.)

around the restaurant and would act jealous when she waited on male customers. (Id. at 54-58.)  His behavior was such that customers believed that Cook liked Bradley, prompting the customers to ask Bradley if she and Cook were in a relationship.  (Id.)  Bradley also testified that Cook was critical of her and would find reasons to "tear into her" if she told him that she was going out of town.  (Id. at 58-59.)  Cook also called Bradley into his office to discuss her "attitude" problem on several occasions.  (Id. at 59-60, 132-33, 137.)

        In addition, Bradley alleges that "pretty much every time she would sit down" Cook "would always stare between my legs, [at] my crotch."  (Id. at 62-63.)  Cook would do this during working hours while customers were present, and it occurred every day from September or October of 2005 until she was terminated in January 2006.  (Id. at 62, 64-65.) On two of these occasions when Cook was staring at her crotch, Bradley alleges that Cook also licked his lips in a suggestive manner.  (Id. at 66, 145; Pl. Ex. 2.)  Bradley did not say anything to Cook about any of this behavior, however.  (Id. at 65-66.)

        One day near Christmas 2005, Bradley wore black leather pants with a red top to work.  (Id. at 67.)  Bradley testified that Cook told her that she "looked real good . . . and he [Cook] would like to get into [her] black pants."  (Id.)  Bradley did not respond to this comment, but looked at Cook and walked away.  (Id. at 68.)

13

Cook did not say anything else. (Id.) Bradley reported this comment to Johnson. (Id.)

Bradley also testified that Cook asked her to go on a trip with him to Florida to attend a professional football game. (Id. at 145.) Additionally, in her sworn interrogatories, Bradley alleges that Cook told Bradley that he wanted to "taste" her, told her that she owed him, and tried to massage her feet. (Pl. Ex. 2.) Although Bradley did not testify about these alleged comments in her deposition, she stated that any incidents of sexual harassment that she could not remember during the deposition were accurately reflected in her interrogatories. (Bradley Dep. at 92, 153.) The record is silent as to whether Bradley reported these alleged comments.

Bradley testified that the harassment caused her to lose interest in her job. (Pl. Ex. 2; Bradley Dep. at 71.) She also stated that she dreaded coming to work each day. (Id.) Because of Cook's harassment, she attempted to distance herself from him and only communicated with him when it was absolutely necessary. (Pl. Ex. 2.) Hollins, Bradley's supervisor, testified that she could tell that something was bothering Bradley, but she did not know what it was, although Bradley told Hollins on four or five occasions that Cook was making sexual advances towards her. (Hollins Dep. at 26-29; Bradley Decl. ¶ 3.)

14

Bradley first reported Cook's behavior to Johnson in late November 2005. (Bradley Dep. at 69.)  She testified that she called Johnson and asked him to talk to Cook and to "tell him to stop."  (Id. at 68.)  Bradley alleges that Johnson responded by asking her if she had spoken to anyone else about the situation.  (Id. at 68-69.)  When she replied that she had not, Johnson stated "Well, don't.  Squash it. . . . I'll be up there and I'll keep an eye on things."  (Id. at 69.)  He further stated that Bradley was "about to open up a can of worms."  (Id. at 70.)

After Bradley reported to Johnson, Johnson came into the restaurant for a couple of days.  (Id. at 94.)  He asked Bradley how things were going, and Bradley responded that it was "okay and that was it."  (Id.)  Bradley does not know if Johnson spoke with Cook, but she assumed that he did because of Cook's attitude.[11]  (Id. at 95, 136-37.)  Although, Bradley contends that things "calmed down for a minute," she testified that "after about a week or two it started back and then it was even worse."  (Id. at 128, 136.)

Bradley again spoke with Johnson the first week of January 2006.  (Id. at 92.)  She called him after work one day and asked Johnson to speak with "[his] friend," Cook, because it was "getting to me a little bit much."  (Id. at 93.)

---

[11] Bradley stated that she could tell by the way Cook would look at her and that Cook was very upset.  (Bradley Dep. at 137.)  Cook never said anything to Bradley about it, however.  (Id.)

Because Johnson was on his cellular phone, however, the call was dropped, and Bradley had to call Johnson back.  (Id.)  She "was telling him a few things and . . . could tell that he didn't want to hear it.  He told me, he says, 'Well, I've got to make a call' --- 'I got another call.  I'll get back to you.'  So he called me about an hour later . . . he said, 'Well, I told you I was going to call you back, so I did."  (Id.)  However, Johnson did not say anything else.  (Id.)  Because Bradley felt that Johnson was not interested in what she had to say, she did not push Johnson and tell him anything further about Cook's behavior.  (Id. at 96.)

### D.  Transfer and Termination

On December 27, 2005, Bradley was transferred from her position as floor manager of Glory's Restaurant to a clerical position on the civic center or administrative side.  (Bradley Dep. at 107; Cook Dep. at 89-90.)  The record is unclear as to who made the decision to transfer Bradley.  Johnson testified that he made the decision based on Bradley's poor performance and in an effort to determine her future status with the FCCA.  (Johnson Dep. at 123-24, 126.)  Cook, however, also testified that he made the decision to transfer Bradley.  (Cook Dep. at 89-90; 177-78.)  Although Cook's testimony is not as definitive as Johnson's on the issue, Cook clearly testified that he decided to move Bradley over to the civic center side because, although she was struggling with her computer duties, Cook

16

thought that the move would be better for her, considering her background.  (Id. at

89-90.)  Bradley testified that Cook told her that she was being moved to a new

position because Cook "felt that [Bradley] has pretty much learned the restaurant

business, so he was pretty much moving me to his assistant" because she "was

doing an excellent job." (Bradley Dep. at 80.)

In this new administrative position, Bradley did not perform any of her past

floor manager duties.  (Cook Dep. at 89-90; Johnson Dep. at 50.)  Bradley had an

office on the administrative side of the civic center, near Cook's office.  (Cook

Dep. at 96.)  Bradley's pay remained the same after the transfer.  (Bradley Dep. at

80.)

A few weeks later, on January 12, 2006, Bradley received a call at home

from Cook.  (Id. at 139.)  Because it was normally a day that Bradley worked,

Cook asked Bradley why she was not at work because he needed to speak with

her.  (Id.)  Bradley told Cook that she was not coming in that day[12] because she

had a doctor's appointment, but that she would come in the next day and meet

with him at 11:00 a.m.  (Id.)  When she arrived, Cook asked Bradley to turn in her

keys and sign a sheet of paper which she contends pertained to a suspension.  (Id.

---

[12] Bradley's testimony is confusing regarding whether she worked half a day on the 12th
or whether she did not work at all.  (Bradley Dep. at 139.)  At the very least, it is clear that she
was not at work when Cook called and did not come into work upon Cook's request.  (Id.)

17

at 140.)  Bradley refused to sign it, and Cook informed her that she was suspended

with pay until further notice.  (Id. at 140-41.)  This document is not in the record.

A few days later, on January 14, 2006, Bradley received a letter stating

that she was being placed on administrative leave "because her daily work ethic as

front of the house floor supervisor has come under question and scrutiny due to

your lack of management skills, job knowledge, job performance and attention to

operational detail."  (Def.'s Ex. H; Bradley Dep. at 97-100.)  Bradley received

another letter, dated January 18, 2006, stating that she was to appear at a

determination hearing on January 20, 2006.[13]  (Id.; Bradley Dep. at 102-03.)

The determination hearing was held on January 20, 2006, and attended by

Bradley, Cook, Johnson and Scott.[14]  (Bradley Dep. at 104.)  According to

Bradley, Johnson conducted the meeting and allowed Cook to speak first.  (Id.)

---

[13] Scott testified that, before the meeting was held, he was under the impression that the meeting was to address Bradley's claims of sexual harassment against Cook, and that Cook's complaints about Bradley's performance did not come up until the meeting started.  (Scott Dep. at 39-42, 44-45.)  This testimony is inconsistent with the letter dated January 14, 2006.

[14] There is confusion in the record whether there was one meeting discussing Bradley or two.  Johnson testified that there were two meetings – one to discuss her sexual harassment complaints and then a later meeting to discuss her work performance, which resulted in her termination.  (Johnson Dep. at 84-98.)  With regard to the alleged first meeting, Johnson testified that after hearing Bradley's allegations and Cook's response, Johnson and Scott determined that her allegations were not believable.  (Id.)  Johnson also testified that Bradley's work performance came up in this first meeting.  (Id.)  Bradley denies that the first meeting occurred.  Cook and Scott's testimony is unhelpful and adds more confusion to whether there was an additional meeting regarding Bradley.  However, because of the standards used at the summary judgment stage, the court assumes that only one meeting occurred.

18

When asked what Cook said during the meeting, Bradley testified that Cook said

"he thought that I was a real go-getter and he thought I was a real good employee,

but it turned out to be I was so lousy and I just wasn't what he was looking for."

(Id. at 105.)   Cook also brought up the "typos" Bradley made on a report, while

working on the administrative side of the civic center.[15]   (Id.)  Bradley testified

that Cook did not mention anything about Bradley's attitude.  (Id. at 110-11.)

Cook testified that he told Johnson and Scott that Bradley was "out of it . . . she's

sitting around and doing nothing."  (Cook Dep. at 59.)  He also reported that

Bradley was unable to update the information on the computer, including

maintaining records on inventory, invoices and time cards.  (Id. at 60-62.)

Bradley was then given a chance to respond to Cook's allegations.  (Bradley

Dep. at 111.)  She stated that she "addressed the things that Mr. Cook had brought

up and I also told Mr. Scott and Mr. Johnson that we didn't have a problem until I

started complaining to Mr. Johnson about Mr. Cook's behavior."  (Id.)  Bradley

testified that Johnson responded that "he was going on pretty much on what Mr.

Cook had told him and all this other stuff that [Bradley was] complaining about,

[Johnson] didn't care to hear it."  (Id.)  Because of Johnson's statement that "he

---

[15] Bradley testified that this was the first time she had learned of these errors, but admitted to making an error, like typing "too many zeros or something."  (Bradley Dep. at 105-06.)

didn't care to hear it," Bradley did not go into detail about any of her allegations of sexual harassment.  (Id.)  Scott asked Bradley to rate herself on a scale from 1 to 5, and Bradley rated herself a 4.  (Id. at 112.)

After Bradley spoke, Bradley alleges that Cook responded by stating "after sitting up here hearing, listening to all these lies, I could never work with her again."  (Id. at 114.)  At this point, Bradley testified that she and Cook left the meeting for Johnson and Scott to confer.[16]  (Id. at 155.)  Johnson testified that he took into account the statements by both Bradley and Cook.  (Johnson Dep. at 87-88, 96-97.)  He further testified that Johnson and Scott determined that Bradley's vague complaints of harassment were unfounded, and they believed Cook's statements that Bradley was inefficient and did not adequately perform her job.  (Id. at 101, 122.)  Scott testified that he relied on Cook regarding Bradley's work performance issues and when Johnson proposed that Bradley be terminated, Scott

---

[16] Bradley's brief contends that, reading the evidence in the light most favorable to her, the court should find that Cook participated in the decision to terminate Bradley.  The evidence does not support Bradley's contention.  Bradley clearly testified that Cook did not participate in the termination.  Bradley bases her argument, however, on Johnson's deposition testimony.  While it is true that Johnson first testified that Cook voted in her termination decision, (id. at 130),  Johnson later testified that he needed to "correct" his earlier testimony to make clear that Cook did not vote in the decision to terminate Bradley.  (Id. at 145, 149-50.)  It is undisputed that Johnson was still under oath at the time he made this correction.  While the fact that Johnson's testimony changed throughout his deposition and after a meeting with counsel is certainly a point that Bradley may raise in front of a jury, it does not change Johnson's ultimate testimony that Cook did not participate in the decision to terminate Bradley.

agreed.  (Scott Dep. at 70-71, 77, 109.)  After about fifteen or twenty minutes,

Johnson called Bradley and Cook back and asked Bradley to resign.  (Bradley

Dep. at 155.)  Bradley refused to resign, and she was terminated.  (Def.'s Ex. H.)

## IV.  Analysis

Bradley claims that FCCA discriminated against her on the basis of her

gender when it (1) subjected her to sexual and retaliatory harassment, which

constituted a hostile work environment and/or culminated in a tangible

employment action; and (2) retaliated against her when it terminated her because

she refused to engage in a sexual relationship with Cook and/or because she made

complaints of sexual harassment against Cook to the FCCA.  (See Compl. ¶¶ 30-

31.)  With regard to her gender harassment claim, the FCCA argues that Bradley

cannot establish that Cook's alleged conduct was severe or pervasive and that

Bradley failed to report the alleged conduct under the FCCA's policy.  With

regard to her retaliatory discharge claim, the FCCA contends that Bradley did not

engage in protected activity, she cannot establish a causal connection between any

protected activity and her termination, and she cannot establish pretext.  The court

first addresses Bradley's gender harassment claim and then moves onto her

retaliation claim.

### A. Title VII Gender Harassment Claim

Title VII provides that an employer "shall not discriminate against any individual with respect to his terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . ."  42 U.S.C. § 2000e-2(a)(1).  Although Title VII does not explicitly mention sexual harassment, courts have recognized that harassment which changes the terms or conditions of employment constitutes a violation of the Act.   See, e.g., Meritor Savings Bank v. Vinson, 477 U.S. 57, 67 (1986); Mendoza v. Borden, Inc., 195 F.3d 1238, 1244-45 (11th Cir. 1999) (en banc).  A plaintiff may rely upon one of two theories to prove sexual harassment in violation of Title VII.  "Under the first theory, the plaintiff must prove that the harassment culminated in a 'tangible employment action' against her.  Under the second or 'hostile work environment'[17] theory, the plaintiff must prove that she suffered 'severe or pervasive conduct.'"

---

[17] The court is aware that in Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), the Supreme Court indicated that courts should no longer use the "hostile work environment" label in analyzing whether an employer should be held liable on a Title VII claim in which no tangible adverse employment decision has been made.  See Frederick v. Sprint/United Management Co., 246 F.3d 1305, 1311 (11th Cir. 2001).  Instead, when analyzing whether an employer should be held liable for a supervisor's harassment, courts should separate these cases into two groups: (1) harassment which culminates in a "tangible employment action," such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse "tangible employment action" is taken but which is sufficient to constructively alter an employee's working conditions. Ellerth, 524 U.S. at 761-63; Faragher, 524 U.S. at 790, 807; see also Johnson v. Booker T. Washington Broadcasting Serv., Inc., 234 F.3d 501, 508 (11th Cir.2000) (recognizing shift in terminology).  That being said, however, courts, including the Eleventh Circuit, continue to use the short-hand label "hostile work environment" when referring to this second type of case.  See Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1231 (11th Cir. 2006).  The court does the same.

Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1231 (11th Cir.

2006).   Plaintiff contends that she is able to establish sexual harassment on the

basis of both theories.[18]

### 1.   Tangible Employment Action

In Mendoza, the Eleventh Circuit, sitting en banc, described sexual

harassment that culminates in a tangible employment action as follows:

> The paradigm of sexual harassment as federally prohibited
> employment discrimination occurs when an employee's expressed
> terms of employment, such as salary or continued employment, are
> conditioned upon compliance with the employer's sexual demands. . .
> . In such a case, . . . the "discrimination with respect to terms or
> conditions of employment [is] explicit."

195 F.3d at 1245 (quoting Ellerth, 524 U.S. at 752).  An employer is subject to

vicarious liability for the actionable hostile environment created by the victim's

supervisor, where that supervisor has the authority to affect the terms and

conditions of the plaintiff's employment.  See Faragher, 524 U.S. at 807.  To

establish a prima facie case under the "tangible employment action" theory, a

plaintiff must show the following: (1) that she belongs to a protected group; (2)

---

[18] Although it is abundantly clear in Bradley's complaint that she pursues her gender
harassment claim under both, alternative theories, the FCCA did not address Bradley's tangible
employment action theory in its brief in support of its motion for summary judgment.
Additionally, as earlier noted, the FCCA did not file a reply brief, although it had the opportunity
to do so.

that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that she suffered a tangible employment action; and (5) that there is "a causal link between the tangible employment action and the sexual harassment." <u>Cotton</u>, 434 F.3d at 1231.  Under this analysis, when a supervisor engages in harassment which results in an adverse "tangible employment action" against the employee, the employer is automatically held vicariously liable for the harassment.  <u>Ellerth</u>, 524 U.S. at 763; <u>Faragher</u>, 524 U.S. at 790.

"Tangible employment action" cases, formerly referred to as "*quid quo pro*" which is Latin for "something for something," are reserved for incidents where an "employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action being taken against her," <u>Hulsey v. Pride Restaurants, LLC</u>, 367 F.3d 1238, 1245 (11th Cir. 2004), or where "a supervisor . . . take[s] a tangible employment action against an employee because she refused to give in to his sexual overtures."  <u>Id.</u>   In this Circuit, however, there is a "longstanding rule . . . that a victim need not provide evidence of a direct and express sexual demand to make a claim under the 'tangible employment action' analysis."  <u>Frederick v. Sprint/United Management Co.</u>, 246 F.3d 1305, 1312 (11th Cir. 2001) (citation omitted).  "[A] supervisor may simply intimate that a

24

subordinate's career prospects will suffer if she does not submit to his advances, with the hope of concealing his harassment if his statements are repeated to a third party."  Id.

Notwithstanding this "longstanding rule," Bradley's allegations do not fit into the "tangible employment action" mold.  The vast majority of the evidence regarding Cook's harassment is limited to crude statements, sexual innuendos and sexually-charged actions, such as staring at Bradley's crotch every time she sat down for a four month period.  Cook never made any explicit demands for sex, nor did he ask for any other kind of sexual favor, or even signal that Bradley needed to perform some sexual act in order to keep her job.  Instead, Bradley's testimony is more akin to general sexual harassment which affected the terms and conditions of her employment.[19]

However, Bradley stated in her sworn interrogatories that she believed that Cook  propositioned her for sex when he made the "pussy and dick ain't shit" comment at her home in July or August 2005.[20]  (Pl. Ex. 2.)  Specifically, she

---

[19] Bradley testified that the harassment caused her to lose interest in her job and she dreaded coming to work each day.  (Bradley Dep. at 71; Pl. Ex. 2.)

[20] Bradley's later deposition testimony contradicts this interrogatory response.  In her later deposition, Bradley testified that she was unsure what Cook meant by the comment, but she assumed that "he was trying to get around to talk about sex."  (Bradley Dep. at 51.)  However, because of the standards at the summary judgment stage, the court must read the evidence in the light most favorable to Bradley and assume that she believed Cook was propositioning her for

stated that she believed the comment was "another comment[] that he wanted to have sex with me."  (Id.)  Bradley did not specify what other comments she refers to when she stated that it was "another comment," however.  She is clearly not referring to any of the comments and actions of Cook which occurred at work, as she testified that the "pussy and dick ain't shit" comment occurred before any of the harassment at work.  In fact, in her deposition, Bradley testified that this comment was the first incident of harassment.  (Bradley Dep. at 48.)

This is not a case, like Frederick v. Sprint/United Management Co., where the combination of previous overtly sexual behavior with a seemingly innocent comment could reasonably be construed by the plaintiff as a demand for sex.  246 F.3d at 1309.  Instead, Bradley testified that Cook made a crude comment, which she subjectively perceived as being "another comment[] that he wanted to have sex with me."  (Pl. Ex. 2.) Without any evidence as to any previous incidents of harassment, and without any evidence as to what those earlier comments were, no reasonable juror could conclude that the harassment alleged could allow an "inference[] [to be] drawn from the observable facts," Llampallas, 163 F.3d at 1246, which would establish that Bradley's "refusal to submit to [Cook's] sexual demands result[ed] in" her termination. Hulsey, 367 F.3d at 1245.  As such,

sex.

Bradley failed to establish a claim of gender harassment under the tangible employment action theory.  For these reasons, the FCCA is entitled to summary judgment in its favor on plaintiff's claim of gender harassment under the tangible employment action theory.  The court now moves on to her second theory of gender harassment, hostile work environment.

### 2. Hostile Work Environment

A plaintiff attempting to show that she has been subjected to a hostile work environment by a supervisor must prove a number of elements to establish the claim.  These elements include proof that: (1) the employee belongs to a protected group; (2) the employee has been subject to unwelcome harassment; (3) the harassment was based on the sex of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) a basis for holding the employer liable.  See Mendoza, 195 F.3d at 1245.  A prima facie showing of a hostile work environment arises only where the harassment is so "severe or pervasive" as to "alter the conditions of employment and create an abusive working environment."  Faragher, 524 U.S. at 786 (citing Meritor Sav. Bank, 477 U.S. at 67).  The courts' interpretations of the general standard announced in Meritor "are sufficiently demanding to ensure that Title VII does not

27

become a 'general civility code.'"  Faragher, 524 U.S. at 788 (citing Oncale v.

Sundowner Offshore Serv., Inc., 523 U.S. 75, 80 (1998)).  For example, offhand

comments, isolated incidents (unless extremely serious), and other similar

tribulations of the workplace will not amount to changes altering the terms and

conditions of employment.  See id.

Furthermore, to be actionable under the statute, the work environment must

be offensive on both an objective and a subjective level.  Id. at 787.  That is, the

environment must be "one that a reasonable person would find hostile or abusive,

and one that the victim in fact did perceive to be so."  Id.  This is a question to be

determined with regard to the totality of the circumstances.  See Henson, 682 F.2d

at 904.  Additional factors for courts to consider in the totality analysis include:

the frequency of the discriminatory conduct, the severity of the conduct, whether

the conduct is physically threatening or humiliating or a mere offensive utterance,

and whether the conduct unreasonably interferes with an employee's work

performance.  See Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993).

Where no adverse employment decision has resulted from the harassment,

the Faragher court allows the employer an affirmative defense.  See id.; see also

Pennsylvania State Police v. Suders, 542 U.S. 129, 148 (2004).  The affirmative

defense requires the defendant to prove "that the employer exercised reasonable

28

care to prevent and correct promptly any sexually harassing behavior." <u>Faragher</u>, 524 U.S. at 807.  The defendant must also prove that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise, or the defendant must show that it responded by taking reasonable corrective action after the plaintiff took advantage of the preventive or corrective opportunities provided by defendant.  <u>See</u> <u>id.</u>

It is undisputed that Bradley established four of the five elements of her prima facie case: she belongs to a protected class; she has been subject to unwelcome harassment; the harassment was based on her sex; and there is a basis for holding the employer liable.  The FCCA contends, however, that Bradley failed to establish a prima facie case of hostile work environment gender harassment because the alleged conduct was not severe or pervasive.   The court disagrees.  Bradley makes the following allegations of sexual harassment:

- "Pussy and dick ain't shit" comment at her home and Bradley's conclusion from the context of the conversation that Cook wanted to talk about sex, (Bradley Dep. at 48-51);
- Cook would follow her around the restaurant and would act jealous when she waited on male customers, prompting male customers to ask her if she was in a relationship with Cook. (Id. at 54-58);
- "[P]retty much every time she would sit down" Cook "would always stare between my legs, [at] my crotch."  (<u>Id.</u> at 62-63.)  Cook would do this during working hours while customers were present, and it

occurred every day from September or October of 2005 until she was terminated in January 2006.  (Id. at 62, 64-65);

- On two of the occasions when Cook was staring at Bradley's crotch, Cook licked his lips in a suggestive manner.  (Id. at 66, 145, Pl. Ex. 2);

- Cook told her that she "looked real good . . . and he [Cook] would like to get into [her] black pants." (Id. at 67);

- Cook asked her to go on a trip with him to Florida to attend a professional football game.  (Id. at 145); and

- Cook told Bradley that he wanted to "taste" her, told her that she owed him, and tried to massage her feet.  (Pl. Ex. 2; Bradley Dep. at 92, 153.)

Although Bradley's allegations do not rise to the level of "severe," as that term is understood in the Eleventh Circuit, they do qualify as "pervasive."  The court first notes the frequency of the alleged harassment.   All of the incidents occurred within a five month time period.  More importantly, for four of those five months, beginning in September or October 2005 and continuing until her termination in January 2006, Bradley alleges that the harassment continued on a "daily basis," including Cook staring at her crotch every time she sat down. Second, Cook's alleged conduct occurred around customers, and even prompted some customers to ask her whether she was in a relationship with Cook.  A reasonable juror could clearly see such incidents as humiliating to Bradley. Finally, the court notes the interference the alleged harassment had on her job. Bradley testified that because of the daily harassment, she lost interest in her job

and that she dreaded coming to work every day.  Her co-workers also noticed that

something seemed wrong with Bradley, further evidencing the effect it had on her

work performance.  These allegations, in combination, read in the light most

favorable to her, qualify as "pervasive," as Bradley testified that they occurred on

multiple occasions every day for a period of four months.  Although a jury could

easily conclude that Bradley was not subject to sexual harassment that was

sufficiently severe or pervasive to create a hostile work environment, because the

inquiry is so fact intensive and contextually specific, Bradley's allegations meet

the threshold of what is required for the case to reach a jury.  See Sparks v. Pilot

Freight Carriers, Inc., 830 F.2d 1554, 1561, n.13 (11th Cir.1987) ("With access to

all the evidence, and with the common sense to make credibility determinations, a

factfinder should not find it difficult to distinguish between harassing actions that

constitute a violation of Title VII and those 'ambiguous' actions which simply

may not 'create an abusive working environment.' ").

The FCCA may still avoid liability, and be awarded summary judgment, if it

establishes the Faragher/Ellerth defense.  As explained above, an employer avoids

liability under this defense if: (1) it "exercised reasonable care to prevent and

correct promptly any sexually harassing behavior"; and (2) the employee

"unreasonably failed to take advantage of any preventative or corrective

31

opportunities [it] provided." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. As an affirmative defense, the defendant bears the burden of establishing both of these elements.  See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1313 (11th Cir. 2001).

The FCCA has failed to carry its burden.  The record contains a dispute as to whether the FCCA even had a policy regarding sexual harassment at the time Bradley was employed.  Although Johnson testified regarding the sexual harassment policy, its distribution, and his instruction regarding the policy, (Johnson Dep. at 18-22), Bradley testified that she never heard of or saw any sexual harassment policy or reporting procedures while she worked at the FCCA. (Bradley Decl. ¶ 1.)  In addition, the FCCA did not produce any document showing a signed acknowledgment of Bradley's receipt of the policy.  For these reasons, the FCCA cannot employ the Faragher/Ellerth defense.  Summary judgment is due to be denied on Bradley's claim of gender harassment under the hostile work environment theory.

## B.  Title VII Retaliation

Title VII also prohibits an employer from retaliating against an employee for enforcing her rights under the Act: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because

he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Retaliation is a separate claim under Title VII, and to recover under such a claim, a plaintiff "'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith that the discrimination existed."  Gupta, 212 F.3d at 586 (11th Cir. 2000) (citing Meeks v. Computer Assocs. Int'l., 15 F.3d 1013, 1021 (11th Cir. 1994)).  Thus even where a plaintiff has failed to make a prima facie showing of discrimination (or present sufficient evidence of discriminatory treatment), she may still have a valid claim for retaliation.

    To establish a prima facie case of retaliation, a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision.  See Farley v. Nationwide Mut. Ins., 197 F.3d 1322, 1336 (11th Cir. 1999).  A causal connection is established when the plaintiff shows that the decision-maker was aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated.  See id. at 1377.  Thus, a "close

temporal proximity" between the plaintiff's protected conduct and an adverse

employment action generally is sufficient circumstantial evidence of a causal

connection for purposes of a prima facie case.  See id.  On the other hand, a

substantial delay between the protected activity and the adverse employment

action and the absence of other evidence tending to show causation may justify

judgment as a matter of law for the employer.  See Wascura v. City of South

Miami, 257 F.3d 1238, 1248 (11th Cir. 2001); see also Maniccia v. Brown, 171

F.3d 1364, 1370 (11th Cir. 1999).

Once the plaintiff has made a prima facie case of retaliation, the defendant

must come forward with a legitimate, non-discriminatory reason for the adverse

employment decision.  See St. Mary's Honor Cntr v. Hicks, 509 U.S. 502, 507

(1993).  Because a plaintiff bears the burden of proving pretext, after defendant

has articulated a legitimate, non-discriminatory reason for the termination,

plaintiff must present significantly probative evidence proving pretext to avoid

summary judgment.  See Celotex, 477 U.S. at 317.  That is, the plaintiff must

establish evidence from which a reasonable trier of fact would disbelieve rather

than disagree with defendant's articulated legitimate, nonretaliatory reason for the

adverse employment action.  See Combs v. Plantation Patterns, 106 F.3d 1519,

1543 (11th Cir. 1997).

34

The FCCA argues that Bradley failed to establish a prima facie case of

retaliation because she did not engage in statutorily protected conduct and because

she cannot establish a causal connection between any protected activity and her

termination.  Even assuming that she established a prima facie case, the FCCA

contends that Bradley cannot demonstrate pretext.  The court disagrees.

### 1.  Prima Facie Case

Bradley established a prima facie case of retaliation with regard to her

termination.  It is undisputed that Bradley suffered an adverse employment action

in her termination.[21]  Second, Bradley engaged in protected conduct when she first

complained to Johnson in late November 2005 regarding Cook's alleged sexual

harassment.  The argument by the FCCA that she somehow withdrew her

complaint is not supported by the evidence.   The mere fact that she told Johnson

that everything was okay when he came to the restaurant after her complaint does

not come close to a withdrawal of her complaint.  In addition, it is undisputed that

Bradley attempted to raise issues regarding the sexual harassment in early January

2006, but the phone call was cut short,[22] and she attempted to raise the issue

---

[21] Although the FCCA's brief contends that Bradley asserts other adverse employment actions (Def. Br. at 29), Bradley's complaint and opposition brief clearly limit her retaliation claim to her termination.

[22] That Bradley did not go into details when Johnson called her back because she felt like he did not want to hear them is of no moment.  Johnson testified that he understood that the

during the termination hearing, although, again, Johnson did not allow her to go into detail about her allegations.  All three of these complaints qualify as protected activity for purposes of Bradley's prima facie case.

Finally, Bradley established a causal connection between her termination and her complaints of harassment.  As stated above, the general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.  See Gupta, 212 F.3d at 590; Bechtel Constr. Co. v. Secretary of Labor, 50 F.3d 926, 934 (11th Cir. 1995) ("Proximity in time is sufficient to raise an inference of causation.")  Bradley first complained to Johnson about Cook's alleged sexual harassment in late November 2005, and again attempted to complain about Johnson in early January 2006 and during her termination meeting.  Bradley was terminated on January 20, 2006.  Both her attempt to complain in her termination hearing and her second complaint, during the first week of January 2006, demonstrate the "close temporal proximity" necessary to establish circumstantial evidence of a causal connection for purposes of a prima facie case.  See Farley, 197 F.3d at 1336.

_____

purpose of her call was to complain about Cook's alleged behavior.  (Johnson Dep. at 62; Bradley Dep. at 93.)

FCCA argues, however, that the exception to the general "close temporal proximity" rule extinguishes any causal connection. This exception holds that temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct. See Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1355-56 (11th Cir. 1999). In Clover, the plaintiff, who brought a Title VII retaliation claim, had been informed the day after she engaged in protected conduct that she was going to be terminated, and later she was terminated. Id. at 1349. Notwithstanding the close temporal proximity between the protected conduct and the initial decision to terminate the plaintiff, the Eleventh Circuit reversed the denial of the defendant's motion for judgment as a matter of law on the retaliation claim because the plaintiff "failed to present sufficient evidence to establish that [the decision maker] was aware of her protected conduct." Id. at 1355-56.

The facts in Clover, however, do not resemble the facts presented here. First, Johnson obviously knew about Bradley's complaints because they were made to him. Second, although the FCCA argues that one of the decision makers, Scott, was unaware of Bradley's complaints, (Def. Br. at 30), the evidence does not support this argument. First and foremost, Scott testified that Johnson called

37

him to tell him about Bradley's hearing on January 20, and informed him that "Shirley has allegations that Mr. Cook sexually harassed her." (Scott Dep. at 41.) Second, Bradley brought up her complaints regarding Cook during her termination hearing. Bradley testified in her deposition that in her termination meeting, she "addressed the things that Mr. Cook had brought up and I also told Mr. Scott and Mr. Johnson that we didn't have a problem until I started complaining to Mr. Johnson about Mr. Cook's behavior." (Bradley Dep. at 111.) The evidence, therefore, clearly shows that Scott knew that Bradley had made complaints of sexual harassment. As such, Bradley established a prima facie case of retaliation.

### 2. Legitimate, Nonretailatory Reason and Pretext

The FCCA articulated a legitimate, nonretaliatory reason for terminating Bradley – poor performance. The burden now rests with Bradley to establish that retaliation did indeed motivate the FCCA or by producing sufficient evidence to allow a rational trier of fact to disbelieve the FCCA's proffered legitimate reasons, thus permitting, but not compelling, the trier of fact to make a finding of illegal retaliation. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and

the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-

21 (11th Cir. 1993).

Bradley presented evidence from which a rational juror could conclude that

she was retaliated against for making complaints about Cook's alleged

harassment.  Her evidence of pretext, taken as a whole, is sufficient to allow a

rational trier of fact to disbelieve the FCCA's proffered legitimate reasons, thus

permitting, but not compelling, the trier of fact to make a finding of illegal

retaliation.  The most important piece of pretext evidence presented by Bradley is

from the deposition testimony of Cook.  When asked at what point Cook decided

that Bradley needed to be terminated, Cook responded: "When she sat up and

made all these [harassment] claims against me that I didn't, I knew I wasn't a part

of so, yeah."  (Cook Dep. at 124.)  This statement is nothing short of an admission

of illegal intent: that Cook wanted to terminate Bradley because she complained to

Johnson about the alleged harassment.  Because Cook was not the decision-maker,

however, it does not amount to direct evidence of retaliation.

Such evidence falls into the "cat's paw" theory of liability.  See Stimpson v.

City of Tuscaloosa, 186 F.3d 1328, 1331-32 (11th Cir. 1999); Llampallas, 163 F.3d

at 1249.  Under this theory, if the plaintiff shows that a colleague or supervisor

with an illegal animus who lacked the power to terminate an employee made a

biased recommendation that the plaintiff be discharged and that recommendation was followed, it may be inferred that it was the illegal animus was the cause in fact of the termination.  Id.  "In such a case, the recommender is using the decision maker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." Stimpson, 186 F.3d at 1332.  Essentially, where the individual accused of discriminatory or retaliatory animus is "an integral part" of a multi-level personnel decision, their improper motivation may "taint[ ] the entire . . . process." Schoenfeld v. Babbitt, 168 F.3d 1257, 1268 (11th Cir. 1999).

To establish causation under this theory, the plaintiff must establish "that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the [colleague's] recommendation, was an actual cause of the other party's decision to terminate the employee." Stimpson, 186 F.3d at 1331.  That is, "causation may be established if the plaintiff shows that the decisonmaker followed the biased recommendation without independently investigating the complaint against the employee." Id. at 1332.

The evidence at this stage, taken in the light most favorable to Bradley, is clear that Johnson and Scott, the two voting Board members, terminated Bradley based upon Cook's recommendation alone.  There is absolutely no evidence that either Johnson or Scott independently investigated Cook's allegations surrounding

40

Bradley's performance problems.  Although Johnson testified regarding reports he received from Hollins and Cook regarding Bradley's performance as floor manager, he did not testify that he personally observed any of these alleged deficiencies[23] or that he independently confirmed Cook's complaints regarding Bradley's performance.  As for Scott, he did testify about one incident of poor performance, but that incident was not the impetus for her termination.  As such, Bradley established that the Board was "a mere conduit, or 'cat's paw'" which gave effect to Cook's admitted retaliatory animus.  Stimpson, 186 F.3d at 1332.

Bradley also presented two other pieces of pretext evidence.  The second piece of pretext evidence casts serious doubt on the reason given for her termination.  According to the FCCA, the reason for Bradley's termination relates specifically to her performance as the floor manager of Glory's Restaurant.  However, a month before she was terminated, on December 27, 2005, Bradley was transferred from that position to a clerical position on the administrative side.  (Bradley Dep. at 107; Cook Dep. at 89-90.)  There is no evidence that Bradley

---

[23] The statement of facts in the FCCA's brief is misleading as to this point.  Although the brief strongly suggests that Johnson personally observed Bradley's alleged performance problems, a thorough reading of Johnson's deposition, and the pages cited by the FCCA in support of its statement of facts, show that Johnson was merely reciting what others had reported to him.

performed poorly[24] in that position and her termination letter does not reference her performance in that position.  Because the reason for her termination related to her performance in a position she no longer held, a reasonable juror could disbelieve the proffered reason, thus allowing a finding of illegal retaliation.

Moreover, although Johnson attempted to explain Bradley's transfer as an effort to determine her future status with the FCCA, (Johnson Dep. at 123-24, 126), there is a dispute of fact regarding the reason for Bradley's new position. Cook testified, in direct contradiction to Johnson's testimony, that he made the decision to transfer Bradley.  (Cook Dep. at 89-90; 177-78.) Cook testified that he transferred her to the administrative side because he believed she was better suited for such a position, considering her past employment, even though she had been struggling with some of her clerical duties as floor manager.  (Id. at 89-90.)  In addition, Bradley testified that Cook told her that she was being moved to a new position because Cook "felt that [Bradley] has pretty much learned the restaurant business, so he was pretty much moving me to his assistant" because she "was doing an excellent job." (Bradley Dep. at 80.)  This dispute only bolsters the conclusion that a reasonable juror could disbelieve the FCCA's proffered

---

[24] Although there was some testimony regarding a typographical error Bradley made in a report, this error was not the basis for the FCCA's claim of poor performance.

legitimate, nonretaliatory reason for her termination.

Related to this second point is the final piece of pretext evidence: the absence of any formal disciplinary warnings.  The record is clear that formal, written disciplinary warnings were given by the Board and that "serious" verbal warnings were memorialized on paper, but did not have to be approved by the Board.  (Cook Dep. at 24-25, 36.)  Despite the extensive testimony of both Johnson and Cook regarding Bradley's unsatisfactory performance in her position at Glory's Restaurant, those problems were not serious enough to merit a written disciplinary warning.  (Id. at 160.)  Additionally, of the few verbal warnings given by Cook, none were serious enough to merit writing them down on paper for her personnel file, an action that did not require the approval of the Board.  At the time of Bradley's termination, nothing in her employment file reflected negatively upon her performance.  When an employer's stated motivation for an adverse employment decision involves the employee's performance, but there is no supporting documentation, a jury can reasonably infer pretext.  See Wascura, 257 F.3d at 1245 ("the lack of complaints or disciplinary reports in an employee's personnel file may support a finding of pretext); Lloyd v. Georgia Gulf Corp., 961 F.2d 1190, 1195 (5th Cir. 1992); Hansard v. Pepsi-Cola Metropolitan Bottling Co., 865 F.2d 1461, 1465 (5th Cir. 1989) ("where the only evidence of intent is

oral testimony, a jury could always choose to discredit it.") (quoting <u>Bhaya v.</u> <u>Westinghouse Elec. Corp.</u>, 832 F.2d 258, 262 (3d Cir. 1987), cert. denied, 488 U.S. 1004 (1989)).

Therefore, regarding her retaliation claim, Bradley has presented evidence sufficient to allow a rational trier of fact to disbelieve the FCCA's proffered legitimate reason for her termination, thus permitting, but not compelling, the trier of fact to make a finding of illegal retaliation.  As such, the FCCA is not entitled to summary judgment on Bradley's claim of retaliation under Title VII.

## V.  Conclusion

For the foregoing reasons, the court finds that defendant the FCCA is entitled to summary judgment on plaintiff's claim of gender harassment under the tangible employment action theory.  However, the FCCA is not entitled to summary judgment on plaintiff's claim of gender harassment under the hostile work environment theory, nor is the FCCA entitled to summary judgment on plaintiff's claim of retaliation in her termination.  A separate order will be entered.

**DONE** this the ___1st___ day of April, 2008.

_James W. Hancock_

_____
SENIOR UNITED STATES DISTRICT JUDGE

44